# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Larry W.,

        Plaintiff,

v.

Nancy A Berryhill,
Commissioner of Social Security,

        Defendant.

Civil No. 17-CV-00988 KMM

**ORDER**

---

Fay E. Fishman, Peterson & Fishman, 2915 South Wayzata Boulevard, Minneapolis, MN 55405, Counsel for Larry W.

Pamela Marentette, United States Attorney's Office, 300 S. 4th St, Ste 600, Minneapolis, MN 55415, Counsel for Nancy A. Berryhill.

---

This matter is before the Court on the parties' cross-motions for summary judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 18; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 20.) For the reasons set forth below, the Commissioner's motion is granted and Plaintiff Larry W.'s motion is denied.[1]

## I.    Procedural History and Factual Background

On August 30, 2013, Larry W. filed an application for supplemental security income, alleging disability as of January 1, 2008. Larry W.'s claim was originally denied on January 21, 2014, and again upon reconsideration on August 28, 2014. He

---

[1] Plaintiff in this case will be referred to as Larry W. in accordance with a new local rule designed to protect the privacy of social security claimants.

filed a request for a hearing, which was granted, and testified at the hearing on September 30, 2015. After receiving an unfavorable decision, Larry W. now appeals.

### A. Factual Overview

In his application, Larry W. alleged disability as of January 1, 2008, resulting from cardiomyopathy, depression, and borderline intellectual functioning. Larry W. has an extensive recent history of cardiomyopathic events. Medical records from 2012 to the present show that he suffers from numerous health problems, including hypertension, congestive heart failure, non-sustained ventricular tachycardia, and non-ischemic cardiomyopathy. Larry W. has an implantable cardiac defibrillator to treat his cardiac conditions.

Unfortunately, he has a significant history of medication non-compliance. Since late 2012, Larry W. has regularly received emergent or urgent medical care necessitated by a worsening of his conditions, often attributed to his failure to take his medication. For example, in December 2012, Larry W. was seen for lower limb edema and fatigue, which was diagnosed as cardiomyopathy likely due to medication non-compliance. (R. 421.) In August 2013, Larry W. was hospitalized after experiencing chest pain and shortness of breath. Medical records noted that he was non-compliant with medication, which could explain the sudden worsening in his cardiac function. (R. 355–362.) In October 2013, having missed several cardiology appointments (*see* R. 476), Larry W. sought emergency care after coughing up blood for three days. He admitted sometimes missing doses of his medication. The emergency physician noted that Larry W.'s congestive heart failure was likely exacerbated due to his medication non-compliance. (R. 395.) Again in 2014, Larry W. was hospitalized for several days with acute cardiac symptoms; again he reported that he had only been taking his medication intermittently. (R. 484–85.) This cycle repeats itself throughout the Administrative Record—Larry W. is seen for a worsening of his heart condition, at which point he reveals that he has been noncompliant with his medication. (*See* R. 561–66, 600–07, 608–21.)

In addition to Larry W.'s physical health problems, he also suffers from intellectual impairments. In June 2014, Dr. Alford Karayusuf, a Social Security

2

psychologist, evaluated Larry W. He did not perform IQ testing himself, but instead referred to testing performed by Dr. Warner in 2009, where Larry W. scored a Full Scale IQ of 74, which is within the borderline range of functioning. (R. 569.) Dr. Karayusuf noted that Larry W. presented as more intellectually competent during his interview than that score would suggest, and he was able to perform simple subtraction and immediately recall digits, though his recent recall was impaired. (R. 570.) Dr. Karayusuf opined that Larry W. would not be able to consistently understand and follow instructions or interact with the public, and noted that Larry W. was unable to maintain pace and persistence because of his memory problems. (R. 570.)

In August 2014, Larry W. was examined by Social Security examiner and psychologist Dr. Donald E. Wiger. Larry W.'s intellectual functioning was tested, and he scored a Full Scale IQ of 80, which is the upper borderline range of functioning. (R. 574–75.) Dr. Wiger opined that Larry W. could "carry out work-like tasks with reasonable persistence and pace," and "handle the stressors of at least an entry level workplace." (R. 575–76.) Dr. Wiger also diagnosed Larry W. with major depressive disorder. (R. 575.) In June 2015, Larry W. was seen by a clinician at Natalis Counseling and Psychology, and diagnosed with major depressive disorder and anxiety disorder, with a Global Assessment of Functioning ("GAF") score of 51–60. (R. 652–57.)

Larry W.'s most recent psychological evaluation was performed by Dr. Stephen J. Antonello, also in June 2015. Larry W. scored in the lower borderline section on his IQ test, with a Full Scale IQ of 72. (R. 585.) He scored in the .1% or lower ranks in the areas of daily living skills, socialization, and adaptive behavior, as measured by the Vineland Adaptive Behavior Scales. (R. 586.) Larry W. was found to have a reading level of Grade 2, and a mathematical skill level of Grade 3. (*Id.*) During that same assessment, he was given a GAF of 40–50, and the examiner noted that Larry W. was a potential candidate for ARMHS services. Dr. Antonello suggested that Larry W. would require a reduced schedule of work hours, slow-paced tasks, work with few reading or math requirements, and little social interaction with customers and coworkers. (R. 589.)

3

At the hearing in front of the ALJ in this matter, Larry W. testified that he has a sixth-grade education and was in special education classes for the entirety of his school career. (R. 36.) He indicated that the longest job he ever held was drywalling for a friend for approximately three years. (R. 36–37.) The work was intermittent depending on availability. (R. 37.) Larry W. testified that his physical and mental health problems prevent him from working now. (R. 37–43.) He described being able to walk only half a block before getting short of breath and often spending four to five hours a day lying down due to fatigue. (R. 38–39.) He reported no difficulty sitting and responded "I don't know" when asked what would prevent him from working a job where he sat most of the day." (R. 38–39.) Larry W. also testified to having sleep apnea, but not using his CPAP regularly because he was not used to it. (R. 39–40.) With regard to his mental health, Larry W. described having difficulty reading and focusing, although he testified that he did not have memory problems. (R. 42–43.) He also reported struggling to get along with most people.

Larry W. testified about difficulties in his everyday life. Larry W. lives with his girlfriend and two children, ages eight and six. (R. 43–44.) While his girlfriend works during the day, he watches the children, although during the summer they are often with their grandmother. (R. 44–45.) Larry W. asserted that he can fix food for himself by using the microwave, and that he needs reminders to shower regularly, but can dress himself. (R. 45–46.) He does not help with chores such as doing the dishes or the laundry, and rarely goes grocery shopping. (R. 46–48.) He reported that he spends most of his time when he is alone during the day watching television and sleeping. (R. 48.)

### B. ALJ Kunz's Decision

Administrative Law Judge Mary M. Kunz reviewed Larry W.'s case. ALJ Kunz followed the established five-step evaluation process in making her determination regarding Larry W. *See* 20 CFR 416.920(a). At step one, ALJ Kunz found that Larry W. had not engaged in substantial gainful activity since his application date of August 30, 2013. (R. 16.) At step two, ALJ Kunz determined that Larry W. has several severe impairments: "Obesity, obstructive sleep apnea, non-ischemic cardiomyopathy with congestive heart failure and past implantable cardioverter defibrillator (ICD)

4

placement, borderline intelligence, depression, anxiety disorder, personality disorder, and possible panic disorder with agoraphobia." (*Id.*)

At step three, ALJ Kunz decided that Larry W.'s impairments, singularly or in combination, did not medically equal the severity of one of the listed impairments at 20 CFR Part 404 Subpart P, Appendix 1. (R. 17.) She noted that she paid particular attention to listings 4.02 (chronic heart failure) and 12.05 (intellectual disorder). (*Id.*) ALJ Kunz found that Larry W. did not meet listing 4.02 "while on a regimen of prescribed treatment." (R. 17.) She noted that Larry W. had an extensive history of medication non-compliance, and that during the periods when his heart condition otherwise met listing 4.02, he was not compliant with his regimen of prescribed treatment. (*Id.*)

ALJ Kunz also found that Larry W.'s intellectual impairments did not meet the listing of 12.05, and she rejected his attorney's arguments that the impairments were equal in severity to those in 12.05. (R. 18.) She determined that Larry W.'s intellectual impairments did not meet the "paragraph B" criteria of demonstrating two or more of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. ALJ Kunz found that Larry W. had moderate difficulty in social functioning and maintaining concentration, persistence, or pace, and mild difficulty in activities of daily living. (R. 19–20.)

At step four, ALJ Kunz determined that Larry W. has the residual functional capacity to work with the following restrictions: the work must be sedentary and not involve work at unprotected heights or near hazards; it must be routine, repetitive, and simple; defined as no less than an 8 on the people rating in the DOT/SCO; be low stress; and it must involve no reading or writing. (R. 21.) Finally, ALJ Kunz determined at step five that there are jobs that exist in significant numbers in the national economy that Larry W. can perform, such as final assembler, document preparer, and stuffer. (R. 26–27.) In accordance with her findings, ALJ Kunz determined that Larry W. was not disabled.

5

Larry W. requested review by the Appeals Council, which denied his request. (R. 1.) Thus, ALJ Kunz's decision became the final decision of the Commissioner of Social Security, making this case ripe for review by the District Court. Larry W. appealed to this Court, and he and the Commissioner have cross-moved for summary judgment.

## II. Analysis

The Court does not evaluate Larry W.'s disability claim de novo; rather, the Court reviews ALJ Kunz's evaluation of Larry W.'s claim to determine whether it is consistent with the law and that it is supported by substantial evidence in the record as a whole. *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006); *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005). This review of an ALJ's decision is highly deferential. *See Kelley v. Barnhart*, 372 F.3d 958, 960 (8th Cir. 2004). Indeed, the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999). Where substantial evidence supports the Commissioner's findings, the Court should not reverse those findings merely because other evidence exists in the record to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994).

Although ALJ Kunz's decision merits deference, the Court must also ensure that the ultimate decision properly considered those facts that weigh against ALJ Kunz's conclusion as well as those that support it. "There is a notable difference between substantial evidence and substantial evidence on the record as a whole. . . . [Review of the whole record] must take into account whatever in the record fairly detracts from [an administrative decision's] weight." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (internal quotation marks omitted). Against this backdrop, the Court determines that ALJ Kunz's decision in Larry W.'s case is supported by substantial evidence.

## A. ALJ Kunz's Assessment of Larry W.'s RFC

"The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004) (citing *Depover v. Barnhart*, 349 F.3d 563, 565 (8th Cir. 2003)). Here, ALJ Kunz properly assessed Larry W.'s abilities based on both his physical and mental impairments, and correctly determined that he could perform sedentary work with additional limitations. Larry W.'s arguments to the contrary do not carry the day.

### 1. Larry W.'s Physical RFC

Larry W. first argues that ALJ Kunz's determination of his physical RFC was not supported by medical opinions. This argument fails for two reasons. First, it misstates the law, which does not require that an RFC finding be supported by or directly derived from any specific opinion. Second, ALJ Kunz's finding was supported by substantial evidence throughout the entirety of the record.

"[T]here is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526–27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092–93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527.) Here, ALJ Kunz considered the medical opinions and gave them "some weight." (R. 23.) However, ALJ Kunz further reduced the RFC based on correctly considering other medical evidence in the record.

Moreover, the record as a whole provides substantial evidence that supports ALJ Kunz's determination. First, ALJ Kunz found Larry W. credible when he claimed that his conditions made it difficult to perform sustained walking or heavy lifting. (R. 22.) She reduced the RFC to accommodate this reality, as well as his sleep apnea and increased risk of electrical shock. (*Id.*) However, there is substantial evidence to support ALJ Kunz's finding that Larry W. is physically capable of some

7

work. For example, Larry W. testified that he did not know why he could not work a job where he spent most of the day sitting. (R. 38.) Indeed, the state agency medical experts' opinions each opined that Larry W. would be capable of light work, including lifting weights up to 20 pounds.[2] (R. 129, 144–45.)

Additionally, there is substantial evidence to suggest that Larry W.'s symptoms would be lessened if he was consistently compliant with his medications and treatments. ALJ Kunz highlighted Larry W.'s significant pattern of medication non-compliance and noted that Larry W. acknowledged feeling better when taking his medication. (R. 22–23; *see* recitation of facts, *supra*.) It is clear that limitations caused by unjustified treatment non-compliance may be discredited and not included in the RFC. *E.g.*, *Wildman v. Astrue*, 596 F.3d 959, 969–70 (8th Cir. 2010). There was substantial evidence within the record to believe that Larry W. understood the importance of his medications. For example, after hospitalization in January 2015, Larry W. stated that he was going to take his medications, "no more excuses, now that I know how bad it's gotten." (R. 620; *see also* R. 23.)

Significantly, ALJ Kunz also highlighted evidence in the record showing that Larry W.'s cardiac symptoms tended to improve when he was medication-compliant. (R. 22–23.) In August 2013, Larry W. was hospitalized for shortness of breath after not taking his medication, and his symptoms improved after resuming his diuretic. (R. 22, 355–62.) In January 2014, Larry W. was hospitalized for seven days after treatment non-compliance, but his symptoms "markedly improved" over the course of his hospitalization after restarting his medication. (R. 488; *see also* R. 22.) And the

---

[2] It is worth nothing that ALJ Kunz found that Larry W. required *more* restrictions than either of the medical opinions did and included those limitations in the RFC. The RFC assessment of both medical opinions contained within the record determined that Larry W. would be capable of light work as defined by 20 CFR 416.967(b), including occasionally lifting or carrying up to 20 pounds, and frequently carrying or lifting 10 pounds. (R. 129, 144–45.) However, ALJ Kunz, after considering the entire record, determined that Larry W. had the physical RFC to perform only sedentary work. (R. 21; *see* 20 CFR 416.967(a).) Any claim of harm relating to ALJ Kunz's consideration of the medical evidence made by Larry W. is greatly diminished by this fact.

record is replete with more examples of the unfortunate cycle of acute illness brought on by Larry W. not taking his medications as required.[3] (*See supra.*) Larry W.'s significant improvement with proper treatment supports ALJ Kunz's finding that Larry W.'s physical ailments do not render him incapable of work.

## 2.   Larry W.'s Mental RFC

There is also substantial evidence within the record as a whole to support ALJ Kunz's conclusion that Larry W.'s intellectual impairments do not prevent him from working in some capacity, and ALJ Kunz adequately supported her findings with the record. Larry W. argues that ALJ Kunz did not explain her reasoning for assigning weight to Dr. Wiger's opinion while rejecting the opinions of Dr. Antonello and Dr. Karayusuf.[4] The Court disagrees.

First, ALJs are specifically tasked with resolving disparate opinions from different caregivers. "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. ALJ Kunz may reject the conclusions of any medical expert…if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). Here, ALJ Kunz noted that Larry W.'s psychological assessments resulted in inconsistent evaluations of Larry W.'s capabilities. (R. 23.) For example, Dr. Karayusuf and Dr. Wiger conducted evaluations of Larry W. within two months of each other, but the results were inconsistent. ALJ's Kunz's reasoning for giving Dr. Wiger's evaluation more weight is not particularly well-explained, but

---

[3] The reasoning behind Larry W.'s medication non-compliance is varied within the record. Although it is attributed to insurance issues on at least one occasion (R. 439), the majority of instances either have no explanation or are explicitly a result of Larry W.'s own behavior (*See* R. 357, 394, 421, 484, 497, 519, (no explanation given); R. 40, 429, 474, 561, (Larry W. contributed to his own medication non-compliance).)

[4] The opinion of Dr. Warner, a consultative psychologist, is not discussed in ALJ Kunz's opinion, and warrants no discussion here. An ALJ is not required to discuss every piece of evidence submitted, and her failure to cite specific evidence does not mean that she did not consider it *See, e.g.*, *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

9

"an arguable deficiency in opinion-writing technique does not require [reversal] when that deficiency had no bearing on the outcome." *Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008). Reviewing the record, it is clear that the key difference between Dr. Karayusuf's and Dr. Wiger's evaluations is that Dr. Wiger's is based on his own psychometric testing, whereas Dr. Karayusuf's evaluation relies heavily on testing performed by another clinician five years previously. (R. 23–24, 569–70.) Indeed, Dr. Karayusuf noted in his own opinion that Larry W. "comes across higher than [borderline intellect]" during a clinical interview, but that he deferred to the older IQ testing on that issue. (R. 570.) ALJ Kunz gave Dr. Wiger's opinion the greatest weight because it was supported by his own clinical evaluation and psychometric testing that he conducted and did not give Dr. Karayusuf's opinion weight because it conflicted with Dr. Wiger's opinion (R. 23–24.)

Further, Dr. Karayusuf's report is inconsistent with other evidence within the record. In a function report that Larry W. completed a month prior to seeing Dr. Karayusuf, Larry W. indicated that he played cards and talked with people on the phone and in person "a few times a week." (R. 288.) This is in direct conflict with Dr. Karayusuf's report that Larry W. does not play cards and has "virtually no contact with friends." (R. 570.) Larry W. also reported going to church "every Sunday" and reported no difficulty in attendance, whereas Dr. Karayusuf's report stated that he only attends once or twice a month and could not remember the services. (*Compare* R. 288 *with* R. 570.) Similarly, Larry W.'s Diagnostic & Assessment Interview from Natalis Counseling indicated that his memory was intact, and that he presented with good insight and judgment, in contrast from Dr. Karayusuf's assessment that Larry W.'s memory was deficient and that he had minimal insight. (*Compare* R. 655–656 *with* R. 570.) Overall, there is substantial evidence in the record to support ALJ Kunz's finding that Dr. Karayusuf's opinion did not merit great weight.

ALJ Kunz also adequately explained her reasoning for rejecting the opinion of Dr. Antonello. She noted that Dr. Antonello did not explain several of his conclusions, including why Larry W. would only be able to work two to three hours a day and why he would not be able to maintain employment. (R. 25.) She also highlighted inconsistencies between Dr. Antonello's opinion and the rest of the record. For example, Dr. Antonello opined that Larry W. had marked limitations in

concentration, persistence, or pace, but Larry W. recently scored a low average score of 83 in working memory with Dr. Wiger—something that Dr. Antonello did not test. (R. 25.) Dr. Wiger also noted that Larry W. was not easily distracted and that he followed instructions during his examination. (R. 573–74.) Dr. Karayusuf's examination is consistent with this aspect of the evaluation, noting that Larry W. exhibited good orientation and focus. (R. 570.) ALJ Kunz is permitted to assign less weight to opinions that do not explain conclusions, *Chesser v. Berryhill*, 858 F.3d 1161, 1165 (8th Cir. 2017), or those that are inconsistent with the record as a whole. *Wagner*, 499 F.3d at 848. Here, the Court concludes that ALJ Kunz properly assessed Larry W.'s mental RFC and her evaluation of the various expert opinions was not erroneous.

### B. ALJ Kunz's Credibility Findings

The Court also concludes that Larry W.'s subjective complaints were properly analyzed by ALJ Kunz. An ALJ is "in a better position to evaluate credibility" than this Court, and thus deference is given to the ALJ's decision when it is supported by substantial evidence. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). When evaluating subjective complaints, an ALJ must consider:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication; [and]
5. functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96–7p, 1996 WL 374186 (Soc. Sec. July 2, 1996).[5]

---

[5] SSR 96–7p was superseded by *Social Security Ruling 16–3p Titles II and XVI: Evaluations of Symptoms in Disability Claims*, 2017 WL 5180304 (Soc. Sec. Oct. 25, 2017), which applies to "determinations and decisions on or after March 28, 2016." *Id.* at *1. Because ALJ Kunz's decision was rendered on December 28, 2015, SSR 96–7 and the

Although an ALJ must consider each factor above, she need not expressly discuss each one. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). And the ALJ may discount subjective complaints "if there are inconsistencies in the evidence as a whole." *Polaski*, 739 F.2d at 1322.

ALJ Kunz properly applied this framework during her review of Larry W.'s case. She found inconsistencies between Larry W.'s subjective complaints and the rest of the record as a whole. In particular, ALJ Kunz noted that Larry W.'s medication non-compliance, failure to seek out treatment, participation in daily activities, and sporadic work history were all inconsistent with Larry W.'s allegation of total disability.

Larry W.'s noncompliance with his medication weighs against his credibility insofar as it relates to his claimed inability to perform any work whatsoever. *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016). As discussed in detail above, Larry W. regularly failed to take his medicine as prescribed, which often resulted in him having to seek emergency medical treatment for his worsening condition. The fact that Larry W.'s symptoms seem to be alleviated or greatly improved when Larry W. is compliant with medication and other treatments such as his CPAP machine further supports ALJ Kunz's finding that Larry W.'s claims of disability were not entirely credible. *See id.*; *Mabry v. Colvin*, 815 F.3d 386, 391–92 (8th Cir. 2016). Indeed, Larry W. himself testified that he did not know why he physically could not work at a sedentary job. (R. 38–39.)

ALJ Kunz also properly discounted Larry W.'s subjective complaints regarding his mental health due to his failure to seek treatment. *E.g.*, *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). Larry W. only began treatment for depression in June 2015, despite claiming to have suffered from it for much longer. Larry W. testified that he did not know how to seek treatment prior to this date. However, ALJ Kunz explained that she did not find this credible because Larry W. had successfully obtained treatment for his physical conditions. (R. 25.) ALJ Kunz also noted that no

---

*Polaski* factors are the appropriate standard by which to analyze ALJ Kunz's determination.

follow-up treatment records were found after Larry W.'s first mental health appointment, despite his indication that he wanted medication and therapy. (R. 25.) Failure to seek treatment for one illness, despite seeking treatment for other illnesses, is a factor that an ALJ may consider when determining a claimant's credibility. *See Hensley v. Colvin*, 829 F.3d 926, 935 (8th Cir. 2016).

Larry W.'s testimony regarding his daily activity also weighs against his credibility. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001). Larry W. drives, watches television, attends church, occasionally shops in stores, plays cards and video games, and talks to others on the phone and in person. (R. 26, 47, 288, 570, 584.) Larry W. also watches his children and helps them get their clothes ready, and he is capable of caring for a cat. (R. 26, 44–45, 259.) A claimant's ability to engage in such daily activities weighs against a finding of complete disability. *Ponder v. Colvin*, 770 F.3d 1190, 1195–96 (8th Cir. 2014); *see also Haley*, 258 F.3d at 748.

In sum, ALJ Kunz's determination that Larry W.'s subjective descriptions of his disabilities were inconsistent with the record as a whole is supported by substantial evidence. Because ALJ Kunz is in the best position to weigh a claimant's credibility, *see Cox*, 471 F.3d at 907, this Court will not reverse her determination here.

### C. ALJ Kunz's Step Five Finding

Larry W. argues that ALJ Kunz erred when relying on the vocational expert's testimony in making her step five determination. Specifically, ALJ Kunz asked the vocational expert a hypothetical question regarding jobs Larry W. could perform in light of his limitations, including no reading or writing. In response, the vocational expert testified that Larry W. could perform the jobs of final assembler, document preparer, and stuffer. (R. 54–55.) However, the Dictionary of Occupational Titles (the "DOT") lists each of these jobs as requiring a level 1 or level 2 reading ability.[6]

---

[6] Reading level 1 requires the ability to "[r]ecognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95–120 words per minute. Compare similarities and differences between words and between series of numbers." U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), 713.687-018, 1991 WL 679271. Reading level two requires a "[p]assive vocabulary of 5,000-6,000 words. Read at rate of 190-

U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), 713.687-018, 1991 WL 679271; 249.587-018, 1991 WL 672349; 731.685-014, 1991 WL 679811. Upon cross-examination of the vocational expert by Larry W.'s attorney, the expert specifically reiterated that the jobs would not involve reading. (R. 56.) Larry W. argues that this cannot be accurate, given the reading ability requirements listed in the DOT. However, because the DOT is not the only source for positional requirements, this Court disagrees.

The DOT definitions are a reference that reflect the maximum requirements for each category of positions, not the variations present between each individual job within that category. *See Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000); *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir. 1995). Conflict between the vocation expert testimony and the DOT is not impermissible. *See, e.g.*, *Montgomery v. Chater*, 69 F.3d 273, 276–77 (8th Cir. 1995). Indeed, the vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." *Fisher v. Colvin*, No. 12-cv-1933 (JNE/LIB), 2014 WL 859157 at *21 (D. Minn. 2014) (quoting SSR 00-4p). There is no evidence within the record to indicate that the vocational expert did not consider Larry W.'s additional literacy limitations, as provided by ALJ Kunz, when testifying to the jobs that Larry W. could perform. Thus, ALJ Kunz properly relied on the vocational expert's testimony when making her step five determination.

### III. Conclusion

In sum, although Larry W. clearly struggles with several serious medical and mental health challenges, ALJ Kunz's decision that he is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record as a whole. This Court affirms the Commissioner's decision and grants her motion for summary judgment. Larry W.'s motion for summary judgment is denied.

---

215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes." *Id.* at 249.587-018, 1991 WL 672349.

## IV. ORDER

For all the reasons stated above, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's motion for summary judgment **(ECF No. 18)** is **DENIED**;
2. Defendant's motion for summary judgment **(ECF No. 20)** is **GRANTED**; and
3. This matter is dismissed with prejudice.

**Let Judgment be entered accordingly.**

Date: September 27, 2018         */s/ Katherine Mendez*
                                 Katherine Menendez
                                 United States Magistrate Judge